**KENTUCKY BAR ASSOCIATION,**
Complainant,

v.

**Jack W. STEINER, Jr. KBA Member No. 67445, Respondent.**

**No. 2004–SC–000909–KB.**

Supreme Court of Kentucky.

March 17, 2005.

210

## OPINION AND ORDER

Jack W. Steiner, Jr., engaged in the practice of law in this Commonwealth from 1982 through February 2002, when he voluntarily ceased practice due to a multiplicity of health and later legal and disciplinary problems. His license to practice was temporarily suspended by this court's Opinion and Order of June 12, 2003. Based on the circumstances hereinafter discussed, the Respondent, Jack W. Steiner, Jr., (STEINER) asks he be sanctioned with an indefinite suspension with leave to seek reinstatement after two (2) years from February 2002 (if then deemed qualified), further conditioned upon satisfaction of any remaining restitution due his former law firm. The Kentucky Bar Association (KBA) seeks permanent disbarment.

Effective October 1, 1998, SCR 3.380 (degrees of discipline) was amended to add "permanent disbarment" as a sanction for violations of the Rules of Professional Conduct.[1] At the same time, SCR 3.520 (reinstatement in case of disbarment) was repealed.

This case commenced with a two-count charge issued on July 26, 2002 by the Inquiry Commission. It charged STEINER with violating SCR 3.130–1.15(a) and

1. The ABA *standards for imposing lawyers sanctions allows disbarment as an appropriate sanction, but in the context of the ABA, disbarment anticipates a severe term of suspension* for at least five (5) years. The ABA does not recognize permanent disbarment, as does Kentucky since its rule amendments of October 1, 1998.

(b) for failing to keep clients funds separate from his own property, failing to keep the funds in a separate bank account, failing to keep appropriate records, failing to properly notify his clients of the receipt of all of these funds and failing to promptly deliver to his clients all of that portion of the funds, to which they were entitled. STEINER was also charged with violating SCR 3.130–8.3(a), (b) and (c) for misappropriating funds and defrauding his clients and his law firm/partners of funds due them.

The case was assigned to a trial commissioner and evidentiary hearings were conducted on December 15 and 16, 2003. At the conclusion of the evidence, the commissioner found STEINER guilty of violating SCR 3.130–1.15(a) and (b), noting STEINER had admitted same in his Answer and during the hearing. He also found STEINER violated SCR 3.130–8.3(a), (b) and (c), relying upon STEINER's admissions during the hearing. In making his decision and recommendations, the commissioner considered STEINER's defense by way of mitigation, noting the "tragic events in the respondent's past, while sad and regrettable, do not excuse or mitigate the respondent's conduct." The trial commissioner recommended "permanent disbarment" as the appropriate sanction. After due consideration, the KBA unanimously upheld the report and recommendations of the trial commissioner and voted 16 to 3 for "permanent disbarment."

▆ In reviewing, we note "the Findings of Fact by the trial commissioner and the Board of Governors are advisory only, SCR 3.360; SCR 3.370(7). We make an independent review of the record and findings of fact" *Kentucky Bar Assoc. v. Berry* 626 S.W.2d 632, 633 (Ky.1981). It is our job to establish the appropriate sanction. SCR 3.380.

Albeit, the record and briefs evidence arguments over STEINER's mental state during the violations, we do not read the record as a contest of the violations, since they were essentially admitted, both by the Answer and testimony of STEINER. The record, as we view it, is one in mitigation. Thus, to put our decision in context, we will comment on both the facts of the violations, as well as the evidence in mitigation thereof, as counsel has requested.

STEINER engaged in the practice of law from 1982 through February 2002, after which he ceased practice. During the later years, he was a partner in the firm of Sitlinger, McGlincy, Steiner, Theiler & Karem of Louisville, Kentucky. While so engaged, he handled their subrogation cases, predominantly for several insurance companies. Once a judgment was obtained on behalf of the company, certain payments were made by third-party judgment debtors to satisfy the subrogation judgment. The payments by the judgment debtors where made to STEINER as attorney for the judgment creditors via representation of same through his firm.

Over a period of time commencing in 1996, through February 2002, certain funds collected from judgment debtors by STEINER were not placed into the firm's escrow account for payment to clients; rather STEINER misappropriated these funds for his own use. The total amount was $92,978.93. Testimony at the hearing indicated there were over one hundred (100) instances where STEINER converted clients' funds to his own use. In his Answer and testimony, STEINER admitted he did not keep client funds separate from his own property, did not keep them in a separate bank account, and did not properly notify clients of the receipt of the funds. He also admitted he took the monies described above for his own use and

admitted his conduct involved misrepresentation, dishonesty and deceit.

In February 2002, STEINER underwent heart by-pass surgery and began a period of recuperation at home. It was during this period of time, while taking over his work, that his firm discovered his deceptions. Yet, when first approached by his partners about the theft, he denied it. Only when presented with evidence proving his theft, did he acknowledge his misappropriations.

At the time of the hearing, STEINER was 53 years old and had been married to his wife, Laura, for 26 years. He graduated from high school in Louisville, Kentucky in 1968 and by 1972 was employed as a policeman with the Jefferson County Police Department, where he stayed approximately ten (10) years. In the late 1970's he attended the University of Louisville School of Law night program, graduating with a law degree in 1981. He was licensed to practice law in 1982.

STEINER had married first in 1967 at an early age. He and his then wife, Francis, had two children, a son Jackie born in 1968 and a daughter, born in 1973. STEINER and Francis divorced in 1976 and STEINER was awarded primary custody of their son, Jackie, while Francis was awarded primary custody of their daughter, Jennifer. STEINER raised Jackie on his own for two years until he married his present wife, Laura, in 1978.

By the summer of 1990, Jackie was 23 years old and near graduating from a culinary program at Sullivan College in Louisville, Kentucky. While on a trip in Seattle, Washington, that summer, STEINER and Laura received news Jackie had died in his sleep. The autopsy disclosed Jackie died from a drug overdose.

At the time of Jackie's death, STEINER was on extension for his 1989 income taxes; he obtained another extension later, which put the due date to October 15, 1990. However, on September 12, 1990, STEINER was involved in a motor vehicle accident, wherein he suffered serious and life threatening injuries. For approximately three to four years thereafter, he failed to file state or federal income tax returns.

In 1994 and 1995, he began the process of preparing these back returns and making arrangements to pay back taxes. Regarding his federal income taxes, STEINER had to borrow approximately $175,000.00 to pay off the IRS. He asserts that the repayment of these loans compromised his ability to make regular payments on his ongoing estimated taxes, creating financial pressure. Yet, at this same time, he was heavily involved in numerous community and public service activities. He was elected president of the Louisville Bar Association in 1998. One of the witnesses at the hearing noted because of the large number of civic organizations in which STEINER was participating, his law practice, in some ways, was becoming secondary.

Mr. George Wade Rowatt, Jr., Ph.D. (ROWATT) testified at the hearing for STEINER. ROWATT is a pastoral counselor, as well as a marriage and family counselor and has been involved in counseling for thirty (30) years. Over the years ROWATT has specialized in three to four areas; marriage and family therapy, adolescents in crisis, ministers in crisis, and other traumatized persons. He has worked individually in the areas of depression and grief, particularly with persons who have complicated grief situations, as well as some work with addictions.

ROWATT first met STEINER around the spring of 2002, due to contact from his wife in regards to marriage counseling. He has been working with STEINER

since. ROWATT testified that STEINER had not accepted the reality of the death of his son, had not faced his painful emotions relating thereto, had not dealt with the memories and therefore had not returned to a normal level of functioning since his son's death. In ROWATT's opinion, STEINER's ability to function was interrupted greatly, both in his family and in his profession. ROWATT characterized STEINER's car wreck of September 1990, as an indication of how immobilized he was by his improper handling of his grief. STEINER's inability to handle his taxes and tax payments were also an indicator of his deterioration in ROWATT's opinion.

ROWATT was aware that STEINER had been arrested for DUI in 2000, but did not feel he was an alcoholic; rather he felt he was a problem drinker using the alcohol to self-medicate his grief in order to forget the memories and to run from the pain he had not faced. According to ROWATT, STEINER did not face the issues as he should have. In particular, ROWATT testified STEINER only made his way through the denial stage, the preliminary step in the grieving process. The more involved and meaningful steps in the grieving process where not addressed by STEINER until he began professional counseling in 2002. In his opinion, STEINER's "arrested and complicated grieving process" manifested itself in STEINER's inability to make good decisions. ROWATT characterized his lifestyle and approach following the death of his son as not really caring about himself; a point which ROWATT believed contributed to his health problems. ROWATT further noted undiagnosed and untreated problems arising from an "incomplete grieving process" may continue for years until the person eventually receives appropriate help. In his opinion, unless complicated grief is addressed appropriately, it can continue for well beyond twelve (12)

years. In short, in his opinion, STEINER's thinking and decision-making process was impaired and led to the unfortunate events which are the subject of the present disciplinary proceedings. Noting that STEINER's counseling is still ongoing, he felt if STEINER continues to appropriately deal with his grief process, it's reasonably probable that the conduct which led to this disciplinary proceeding will not recur. He did believe STEINER knew rationally that what he was doing was wrong.

Dr. Andrew Cooley (COOLEY), a board certified psychiatrist, testified for the KBA. COOLEY is the director of Central State Hospital in Louisville, Kentucky. After reviewing various exhibits, as well as the record, including ROWATT's handwritten case notes, COOLEY was of the opinion that STEINER was not suffering from any sort of mental disorder, such as depression, that would have caused him any impairment in cognition or judgment. In COOLEY's opinion, STEINER's ability to maintain his duties and performances, including extensive volunteer work at the level he did, was indicative that STEINER did not have a mental disease during the questionable periods of time. He noted that ROWATT, in his notes, quoted STEINER as saying "I made a big bad decision to hide the money."

 Notwithstanding our rule changes concerning "permanent disbarment," the concepts of rehabilitation and reinstatement have not been written out of our rules. However, the burden of a credible defense to the charge, supported by either fact or law, still remains with the Respondent, *Kentucky Bar Assoc. v. Layton,* 97 S.W.3d 452, 453 (Ky.2003); and the "public is entitled to rely on an attorney's admission to the practice of law as a certification of the attorney's honest, high ethical standards and good moral character."

*Kentucky Bar Assoc. v. Collis*, 535 S.W.2d 95,96 (Ky.1975). "[O]ne purpose for disbarment of an attorney is to uphold the ideals and traditions of an honorable profession." In re *Lynch*, 238 S.W.2d 118 (Ky.1951).

Those admitted to the bar of this state "must be of good moral character..." SCR 2.011 "The term 'good moral character' includes qualities of honesty, fairness, responsibility...and respect for the rights of others...." The purpose "is to exclude from the practice of law...persons possessing character traits that are likely to result in injury to future clients...or in a violation of the Code of Professional Responsibility." SCR 2.011(1) "Fitness is the assessment of mental and emotional health as it affects the competency of a...lawyer." SCR 2.011(2).

In recognition of the significant effects mental, psychological or emotional conditions may have, and have had, on our profession, this court set up the Kentucky Lawyers Assistance Program (KYLAP) in 2003. See, SCR 3.910. Its function is to assist members of our bar in dealing with and working through "impairments" within the context of various practices. Under KYLAP, impairment "includes any mental, psychological or emotional condition that impairs or may foreseeably impair a persons' ability to practice law...Impairment may result from addiction to intoxicants or drugs, chemical dependency, substance abuse, mental disease, mental disorder or defect, or psychological or emotional illness." SCR 3.900(1).

Except for enumerated instances, communications to and information gathered by KYLAP, are confidential. SCR 3.990. SCR 3.970(1), allows any member of the KBA who is the subject of a pending admission or disciplinary proceeding to authorize the appropriate agency to make a confidential request for assistance from KYLAP in evaluating or addressing any actual or potential impairment which may be relevant to the issues which the agency is charged with considering. This court set up KYLAP for the use of the members of this bar, not only in disciplinary proceedings, but on admission, restoration, reinstatement, as well as other matters. See, SCR 3.970–5(a) and 3.980(1). It goes without saying that KYLAP is staffed with people who know and understand "impairment" within the context of our profession.[2] With the hopes of reminding the bar of KYLAP's purpose, we are considerate of the fact that the events and the treatment initially undertaken by STEINER in this case occurred prior to the creation of KYLAP.

 In *Layton, supra,* we held the Respondent had presented no credible defense to the charge supported by either fact or law, even though we noted his current treatment for a "bi-polar disorder." This comment reflects our opinion that except where expressly set out, the Kentucky Rules of Professional conduct have no mental element. SCR 3.130. In short, the mental state of an attorney is an issue of interest to this court, and to the bar itself, in the context of disciplinary proceedings, but it is one that addresses itself to mitigation, not defense. *Layton, supra.* In this case, we find the testimony of COOLEY, a board certified psychiatrist, to be controlling. COOLEY was clear in his opinion that the Respondent suffered from no mental disease or disorder which would impede his ability to know right from wrong and we find no evidence presented by the Respondent to the contrary.

---

**2.** However, KYLAP's staff cannot engage in any activity which constitutes the practice of law or medicine. SCR 3.910(2).

Nor do we find any causal relationship between the conduct admitted and the claimed disability. Even ROWATT acknowledged he believed STEINER knew right from wrong on a rational basis.

The opinion of ROWATT that STEINER's conduct evolved from the death of his son, an improper grieving process, and a failure to deal appropriately with memories, which ultimately led to an interruption of the Respondent's ability to function, was based solely on conversations with the Respondent and his wife. Many witnesses testified to the contrary; that they were shocked to find the Respondent was claiming any functional problems. During the time period that STEINER was taking money from his clients and his firm, he was organizing golf outings for the Louisville Bar Association. He was on the Jefferson County Law Library Board, and served as treasurer of the entity for several years. In 1998, he was elected president of the Louisville Bar Association and was very proactive in seeing to the best interest of the Bar Association. Obviously from this evidence, he operated on a much higher level than the evidence he introduced.

Were this a case where STEINER initially sought treatment, voluntarily disclosing his instances of unprofessional conduct, we might feel more reassured and sympathetic, but admittedly each case stands on its own facts; even emotional injuries. Six years of pilfering, in over a 100 instances, even without a prior disciplinary record, is not something that reassures us of a more honest approach in the future.

For the foregoing reasons, we find the discipline recommended is appropriate, and, therefore, this court adopts the recommendation of the Board of Governors.

It is therefore ORDERED that:

1. The Respondent, Jack W. Steiner, Jr., is permanently disbarred from the practice of law in Kentucky, pursuant to SCR 3.380, having been found guilty of violating SCR 3.130.1.15(a) and (b); 3.130–8.3(a),(b) and (c).

2. The Respondent, Jack W. Steiner, Jr., shall pay the costs of this action in the sum of $5,350.14, for which execution may issue from this court upon finality of this Opinion and Order.

All concur.

ENTERED: March 17, 2005.

/s/ <u>Joseph E. Lambert</u>
Chief Justice