TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0483-KB

IN RE: BENJAMIN GERALD DUSING

IN SUPREME COURT

## OPINION AND ORDER

The Board of Governors (the "Board") of the Kentucky Bar Association ("KBA") has recommended to this Court that Benjamin Gerald Dusing ("Dusing") be suspended from the practice of law for three (3) years, effective on the date of this Order and without credit for time served during his temporary suspension. Upon the Court's independent review of the briefs, the record, and the applicable law, we agree that Dusing's violations are troubling and egregious. We therefore conclude that Dusing's conduct merits the sanction recommended by the Board.

## I.     FACTUAL & PROCEDURAL BACKGROUND

Benjamin Gerald Dusing was licensed to practice law in the Commonwealth of Kentucky on May 1, 2002. His KBA member number is 89178 and his bar roster address is 809 Wright Summit Parkway, Suite 120, Fort Wright, Kentucky 41011. Dusing has no prior disciplinary matters before this Court. While commendable, although not particularly relevant, Dusing points out to us that he has engaged in some humanitarian work with the citizens of the Ukraine.

In 2015, Dusing opened proceedings in Kenton Family Court regarding his divorce from his wife, Julie Tapke, and custody and visitation of their three children (the "Tapke litigation"). In 2019, Dusing also became party to another proceeding in Kenton Family Court, this time regarding the paternity and custody of a daughter born from a relationship Dusing had with Jill Bakker (the "Bakker litigation", and collectively with the Tapke litigation, the "Family Court Proceedings"). Dusing was both represented by counsel and allowed to practice *pro se* in the Family Court Proceedings.[1] Now-retired Family Court Judge Christopher Mehling presided over both cases.

An independent review of the Family Court Proceedings below results in the conclusion that they were decidedly acrimonious. During the litigation, Dusing—both *pro se* and by counsel—filed at least seven motions for Judge Mehling's recusal, as well as numerous interlocutory appeals before the Court of Appeals. Dusing also moved to continue trial several times and moved for disqualification of opposing counsel three days before one scheduled trial date. He threatened disciplinary complaints against both Judge Mehling and opposing counsel, and approached law enforcement to discuss what he contends was criminally corrupt conduct in the proceedings. Dusing asserts that as a result of this and other experiences in Family Court, he and his

---

[1] This accommodation, that Dusing was granted the ability to proceed *pro se* when he was also represented by counsel, is unusual in that Kentucky law has long held a party represented by counsel in civil litigation may not also act *pro se*. *Talbot v. Talbot's Reps.*, 25 Ky. 3, 4 (1829) (enslaved person at issue) ("A party has the right to appear '*in propria persona*' or by counsel. This right is alternative. A party has no right to appear both by himself and counsel. It would be irregular and very inconvenient to permit him, '*ex gratia*,' to do so."); *Abert v. Berry*, 8 Ky. Op. 343 (1875).

attorney, Katy Lawrence, formed Families Advocating for Reform of the Courts ("FARC"), a group advocating for reform of the court system. Generally, this Court respects and encourages the public's right to advocate for betterment of the justice system.

On November 2, 2021, Dusing posted a video to Facebook that he acknowledges was "crass," "offensive," "imprudent," and "undoubtedly a mistake of judgment." Before delving further into the facts of this incident, however, some brief background on the pre-ruling practices of the Kenton Family Court is necessary. Like at least some other family courts in the Commonwealth, the Kenton Family Court utilizes a pre-ruling docket to address motions filed with the court. Kenton Fam. Ct. Local Rule ("LR") 203. Under this system, the family court judge will consider motions filed for motion hour and issue initial "pre-rulings" on those motions. LR 203.03. Pre-rulings may include granting or denying a motion, directing the parties to obtain a hearing date from the court for the motion, or designating the motion as "to be called" meaning the judge will hear it at the next regularly scheduled motion hour. *Id.*; LR 203.04. If a party objects to the judge's pre-ruling on a motion, the motion is placed on the motion docket and will be heard by the judge at the next motion hour. LR 203.05.

Dusing contends the video he posted to Facebook was prompted by improper communications between Bakker's counsel, Stephanie Dietz, and Judge Mehling's staff attorney, Alice Keys. We disagree the communications were improper. The communications that prompted the video began on

3

October 29, 2021, when Dietz sent an email to Keys, with Dusing and his counsel Lawrence copied, stating that two motions she had filed—one regarding a name change and one regarding Ring videos—were not addressed in the Family Court's pre-rulings. Keys responded that the motions would be added to the pre-rulings as "to be called," and that Judge Mehling would consider the motions at the regularly scheduled motion hour. Lawrence then responded to note her objection to the motions, further noted she had filed motions on the same subject matter that had been passed to a December 20, 2021, hearing date, and asserted Dietz's motions should likewise be passed to that hearing date.

On November 1, 2021, Keys responded to Lawrence and Dietz and advised that Judge Mehling had reviewed the two pending motions and pre-ruled that Dietz's name change motion would be denied and the Ring video would be called at the motion docket. Keys also noted that because Lawrence had objected, the Ring video motion would be called at the next motion docket on November 15, 2021 in accordance with Local Rule 203.05.

The following day, Dusing posted an incredibly disturbing and threatening video on Facebook setting forth the following diatribe, which we set forth here in full:

> Alright. Alice Keys and Stephanie Dietz, we need to have a little talk, so I appreciate you taking the time. I need to deliver a message to you on behalf of the families, kids, and parents of Kenton County. Now I do need to warn you. The following message that I am going to deliver is going to be—as they say-- BGD style.[2] This is going to be some fairly direct messaging.

---

2 "BGD" are Dusing's initials.

4

Now I understand both of you are more into sort of the victim culture that's the latest fad and I've tried to abide by those standards for a long time now and being very restrained in trying to talk to you about the things that y'all are doing and I have used all the fluffy fluff fluff words that I can come up with and have stood down time and time again and making it clear I had hoped to the two of you that we were on to you. We know exactly what you're doing, and you know, it is not appropriate. And also, inviting you to simply stop doing it. The fucking bullshit that you're engaged in, and I've avoided using curse words. I've spoken very softly and in general terms without naming names for the most part. Inviting you time and time and time and time and time again to knock it the fuck off and stop your corrupt fucking bullshit. The problem with that approach as it turns out is that it hasn't worked, and in my experience that tends to be the case, and the conversation that we're gonna have now and the message that's going to be sent is going to be really fucking direct. Now, you'll have a choice at the end and it will be a fundamental choice. You can't go cry to your mommy and say Ben's a meany pants, play the victim, talk about how I motherfucked you up and down, and reamed your ass out, which I'm about to. You can do that, make it all about you, and be a victim of Ben's little direct messaging here. That's one of your choices that you'll have. The other choice is that you can learn a fucking lesson. You can get honest and get humble and recognize that what you're fucking doing is big-time fucking wrong, and there are serious fucking consequences to it, and you can change, get better and grow, and that's your choice. But I want to make sure you have that choice. And I want to be very fucking clear today about the message I'm sending on behalf of all the people, all the lawyers, all the litigants, all the families, all the kids of Kenton County. And that message is this: Knock it the fuck off. I want to be very clear, so help me God if I see any shit like this again, if I see it one more fucking time, that the restraint that I feel I have shown to both of you, that the ample opportunities I've given both of you to fucking just knock it the fuck off and stop doing petty corruption like this, and it's not that petty. I don't know who the fuck you think you are or what the fuck you think you're doing and how the fuck long you think you can get away with it. It's a pretty crafty little scheme, but at the end of the fucking day, we don't do this shit. This is a court of fucking law, and so long as I fucking see this, I just ain't gonna have it. I just ain't gonna have it, you understand me? My concern is that you don't understand me, and let me say this again. I ain't gonna fucking have it. I feel like I have gone to great lengths to make it clear in a generalized and indirect way that I am aware of what you're doing. And I have invited you to just knock it

the fuck off, just stop it.  And yet, it is quite clear that the message has not gotten through.  I have also become acutely aware that I speak not only on behalf of myself, but on behalf of a lot of fucking people, and I deign today, I am comfortable speaking on behalf of the public directly to you motherfuckers and saying this: Knock it the fuck off.  If you've got a problem with my language, or what I'm saying or how I'm doing it, you fucking stand up like big girls and speak out.  Please sue my ass.  I would be delighted to make your coffee and have you sit in my conference hour, conference room, and answer all the questions that the public has for you, on behalf of all the people that have suffered this bullshit.  This shit doesn't just happen in my case, I know that and you know that.  Not everybody has the ability to stand up to you, but I do, and I am.  And I want you to understand this. **You want to give me the best fucking Christmas gift anybody's ever given me? Give me a fucking reason to blow your asses up.  It'd be the best Christmas gift I've ever gotten.** I've been accused of a lot of shit, ok? I've heard a lot of stuff, all the normal shit.  You know what I've never heard? I've never heard somebody's asked me for help and I haven't helped them.  I've never heard that I made a commitment and I didn't follow through on it.  And I want to make sure that you understand the commitment that I make to you and the people of Kenton County today.  And that commitment is this, I swear to fucking God if I see anything like this again every resource in my arsenal, every ounce of energy that I have and every person that works at this law firm will be committed full bore to bringing the fucking wrath of motherfucking God down on both of you guys.  You understand?  It's fucking bullshit, we're better than this.  It's a court of fucking law and this shit goes on all the fucking time and we know it, everybody knows it.  And this shit stops right fucking now.  Right now.  And if anybody out there, any other lawyers or litigants, experiences the same thing, which they almost certainly will not, it's taken a long time to get to the point where, because of our objections, that the matter is brought to the attention of the judge, and kudos to the judge for doing the right thing and getting it right, and I've always believed that if things operated the way that should and people were aware of these things, he'd get it right, and he did.  He followed the law.  But that fucking shit is bullshit.  Alice Keys, you're not the fucking judge.  Stephanie Dietz, it is fucking wrong to knowingly avail yourself of that kind of corruption.  I don't want to hear that kind of shit, that chickenshit bullshit, I didn't do anything wrong, I just emailed the fucking court.  You emailed the fucking court knowing what you were fucking doing and you were going to get the fucking outcome that you fucking wanted.  You made the decision to take advantage of a corrupt actor and that's just as corrupt and I don't want to

6

hear it.  Listen, bring everything you fucking got if you want to on me, and go fucking nuts that I put this on fucking Facebook.  I only care about one fucking thing, I've caught the two of you with your hand in the fucking cookie jar ten times, and I've stood down a lot.  No more.  On behalf of the people of Kenton County, knock if the fuck off.  I'm glad that we had this talk.

Judge Mehling became aware of Dusing's video and, although he had previously denied at least seven motions to recuse by Dusing, *sua sponte* recused from both Family Court Proceedings given the appearance of impropriety that would have arisen from his presiding over a case involving a litigant who made physical threats against his staff attorney.  In his recusal order, Judge Mehling stated:

> This court has attempted to do its duty in each case, be fair to all, hear the evidence and make rulings while following the law.  This court still believes that this court can be fair and impartial . . . that is this court's duty.  However, by making a direct threat to this court's staff attorney this court believes that there will now be an appearance of impartiality regardless of the facts.  KRS 26A.015(2)(e) requires recusal if the judge "has knowledge of any other circumstances in which his impartiality might reasonably be questioned."[3]  For this reason and this reason alone, this court now recuses in both cases.

Judge Mehling further noted,

> if any litigant can behave in this manner without any consequences, our justice system surely is in grave peril.  This behavior is nothing more than bullying of a court by a litigant.  This is magnified by the fact that the litigant is a lawyer authorized to practice law in this Commonwealth. . . .  This court is quite reluctant to enter this order; on first blush the bully has won.  However, this court believes that it is my duty to now recuse because of the appearance issue, even though it is self-created by Dusing.

---

[3] *See also* Kentucky Supreme Court Rule (SCR) 4.300, Rule 2.11 (stating "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality* might reasonably be questioned[]").

Dusing asserts that his purpose in posting the video was not to make physical threats, but rather to advocate for reform of the court system. The video, including its foul and threatening language, speaks for itself. In a separate incident, Dusing wrote to a guardian *ad litem* (GAL) in the Family Court Proceedings that "[t]his is the last time I use words to express my deepest objection to your conduct in this litigation both personally and professionally." This, too, he contends was not intended as physical threat.

In yet another notable incident, Dusing hired Dr. Ed Connor as a consulting psychologist to advise him in the Bakker litigation. After Dr. Connor issued a custodial evaluation, Dusing's attorney, Joseph Otis, went to Dr. Connor's office and offered him some form of payment. Dusing contends the payment was not a bribe, but rather was for additional services and that Dr. Connor was confused about his role in the litigation. In a written order, however, the Family Court found that Otis at Dusing's direction had offered Dr. Connor $5,000 to change his custodial evaluation and to designate it as preliminary.

The KBA brought three sets of charges against Dusing, all arising from his conduct in the Family Court Proceedings. The first, Case No. 21-DIS-0046, sets forth five charges relating to Dusing's conduct in the Bakker litigation. Count I alleges Dusing violated SCR[4] 3.130(3.5)(d) by filing repeated and frivolous motions and appeals, all with intention to disrupt the tribunal.

_____

[4] Rules of the Supreme Court.

Counts II and III allege Dusing violated SCR 3.130(3.4)(f) when he threatened or presented criminal or disciplinary charges against Judge Mehling and opposing counsel Dietz solely to obtain an advantage in the proceedings. Count IV alleges Dusing violated SCR 3.130(3.4)(b) and SCR 3.130(8.4)(a) when he assisted or induced his attorney Otis to offer $5,000 to consulting expert Dr. Connor to change his custodial evaluation. Count V alleges Dusing violated SCR 3.130(8.2)(a) when he made numerous knowingly or recklessly false statements in pleadings concerning the qualifications or integrity of Judge Mehling.

The second case, Case No. 21-DIS-0142, sets forth three charges relating to Dusing's conduct in the Tapke litigation. Count I alleges Dusing violated SCR 3.130(3.1) by filing multiple motions and pleadings that lacked basis in law or fact. Count II alleges Dusing violated SCR 3.130(3.5)(d) by filing numerous frivolous motions and appeals and by repeatedly emailing the GAL, all for the purpose of disrupting a tribunal. Count III alleges Dusing violated SCR 3.130(4.4)(a) because he also engaged in this same conduct for no substantial purpose other than to delay, embarrass, or burden a third person.

Finally, in the third case, Case No. 21-DIS-0192, the KBA alleges that Dusing's posting of the November 2, 2021, Facebook video violated SCR 3.130(3.5)(d).

On February 24, 2022, we found probable cause to believe that Dusing's conduct "poses a substantial threat of harm to his clients or to the public."

9

*Inquiry Comm'n v. Dusing*, 647 S.W.3d 260, 264 (Ky. 2022).[5] We therefore entered an Order temporarily suspending Dusing from the practice of law until further Order of the Court. *Id.* at 264-65. We also ordered that Dusing submit to a full psychological evaluation within ninety days. *Id.* at 265.

A Trial Commissioner was appointed to hold a hearing regarding the charges against Dusing. Before the hearing, the KBA moved the Trial Commissioner to give the Family Court order regarding Otis's offer of money to Dr. Connor preclusive effect under the doctrine of collateral estoppel. The Trial Commissioner granted the KBA's motion. However, the Trial Commissioner also allowed Dusing to offer testimony as to whether he had in fact inappropriately offered Dr. Connor money to change his report.

On December 12 through 14, 2022, the Trial Commissioner held a three-day hearing regarding the charges. The KBA did not present witnesses, but rather presented documentary evidence consisting largely of pleadings and records from the Trial Court Proceedings. Dusing also presented documentary evidence, as well as his own testimony which spanned a three-day period. He did not present any other witnesses.

On April 24, 2023, the Trial Commissioner issued his Report in which he found Dusing guilty of all the charges against him. The Trial Commissioner

---

[5] The Petition for Temporary Suspension was based on Dusing's actions in posting the Facebook video, KBA File No. 21-DIS-0192, and a bar complaint filed by one of Dusing's clients, Michael Hild. KBA File No. 21-DIS-0187. This latter matter was not addressed or mentioned by the KBA Trial Commissioner and does not factor into our decision.

10

also noted that while he had granted the KBA's motion to give preclusive effect to the Family Court's order regarding the payment to Dr. Connor, that ruling was ultimately irrelevant. While Judge Mehling's ruling supported a finding of such conduct, the Trial Commissioner, even without benefit of that ruling, determined he would have reached the same conclusion on the basis of the evidence he heard. As a sanction, the Trial Commissioner recommended a three-year suspension without credit for the time Dusing has already been temporarily suspended.

On subsequent motion by the KBA's counsel, the Trial Commissioner entered an Amended Report on June 12, 2023, correcting typographical errors but reaching the same substantive conclusions. Dusing appealed to the Board of Bar Governors. After the Trial Commissioner's Amended Report had been issued, Otis testified before the Kenton Family Court that no bribery of Dr. Connor had occurred. Dusing moved the Board to consider that testimony, which the Board denied. On October 25, 2023, the Board by an 11-5 vote adopted the Trial Commissioner's Amended Report and recommended Dusing be suspended from the practice of law for three years without credit for time served during his temporary suspension. Pursuant to SCR 3.370(8), Dusing now seeks review by this Court.

11

## II.    ANALYSIS

### A. *Standard of Review*

In disciplinary proceedings, the KBA bears the burden of proof, and facts must be proven by a preponderance of the evidence. SCR 3.330(4). Following a hearing before a Trial Commissioner, the Trial Commissioner shall issue a report of findings of fact and conclusions of law containing charges made and defense offered; the proceedings; the facts deemed proved by a preponderance of the evidence; and recommended sanction. SCR 3.360(1). Following the issuance of the report, either party may file a notice of appeal, SCR 3.360(4), and the matter is then reviewed by the Board. SCR 3.370. Since this Court makes final determinations of bar discipline, we have held that "the findings of fact by the Trial Commissioner and the Board are advisory only. The Court makes an independent review of the record and findings of fact and may 'enter such orders or opinion as it deems appropriate on the entire record.'" *Ky. Bar Ass'n v. Maze*, 397 S.W.3d 891, 897 (Ky. 2013) (citation omitted) (quoting SCR 3.370(7) and (8)); *see also Ky. Bar Ass'n v. Blum*, 404 S.W.3d 841, 846 (Ky. 2013) (holding "we review alleged violations de novo[]"). We likewise consider an appropriate sanction *de novo*. *Ky. Bar Ass'n v. Steiner*, 157 S.W.3d 209, 211 (Ky. 2005) (recognizing this Court's "job to establish the appropriate sanction[]"); *see also Ky. Bar Ass'n v. Rice*, 229 S.W.3d 903, 903 (Ky. 2007) (imposing sanction of permanent disbarment where Board recommended five-year suspension).

12

### B. 21-DIS-0046 (Bakker litigation)

In 21-DIS-0046, the KBA brought five charges against Dusing alleging six rule violations, all arising out his conduct in the Bakker litigation.

Perhaps the most serious charge is that Dusing assisted or induced his counsel Otis to bribe Dr. Connor in violation of SCR 3.130(3.4)(b) and 3.130(8.4)(a). The former rule states "a lawyer shall not knowingly falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law[;]" and the latter rule states "it is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another[.]" We hardly need mention that bribing a witness is a class D felony. *See* KRS 524.020 (providing "(1) [a] person is guilty of bribing a witness when he offers, confers or agrees to confer any pecuniary benefit upon a witness or a person he believes may be called as a witness in any official proceeding with intent to: (a) Influence the testimony of that person[]").

Pertinent to this charge were Judge Mehling's findings in the Bakker litigation:

> The other custodial expert was Dr. Ed Connor, who was retained by [Dusing]. This court should note some troubling aspects as to Dr. Connor. He is a well-known expert in this court and various Northern Kentucky courts. He was retained by Deanna Dennison, who was one of several attorneys who co-counseled with [Dusing] throughout the case; [Dusing] also represented himself *pro se.* After Dr. Connor's report was issued and after Ms. Dennison had withdrawn from the case, [Dusing] took the position with this court that he had NOT retained Dr. Connor. The record reflects otherwise, and [Dusing] told Dr. Feinberg he had retained Dr.

13

Connor. Dr. Connor's report was not disclosed consistent with [Ky. R. Civ. Proc.] 26.02(4)(a), 35.01 and 35.02 as an expert retained to testify. This court had to issue an order for a release of the report. Most troubling of all, Dr. Connor testified that after issuing his report, [Dusing]'s co-counsel Jeff Otis appeared at his office and offered him $5,000.00 if he would denote the report as preliminary. He then provided Dr. Connor with a large amount of extra records. Dr. Connor refused the request; he did review the additional records and issued an addendum indicating that the records reinforced his opinion. In [Bakker's] rebuttal case she called Tina DeAngelis who had previously been the caretaker of the [Dusing]'s children and was in a sexual relationship with [Dusing]. See more findings below. DeAngelis testified that Dusing and Otis discussed Dr. Connor in her presence. [Dusing] instructed Otis to "manage" Dr. Connor by either paying him or suing him.

Before the Trial Commissioner, Dusing offered the following proof: his own testimony denying instructing or offering a bribe and his claim that Dr. Connor's report was favorable thereby and thus no incentive to offer such a payment existed. He argues Otis testified no bribe occurred.

Based on his review of the trial court record, the Trial Commissioner concluded that Judge Mehling's finding was entitled to preclusive weight in this disciplinary proceeding. *See Moore v. Commonwealth*, 954 S.W.2d 317, 319 (Ky. 1997) (identifying four issues necessary to assert issue preclusion: "(1) identity of issues; (2) a final decision or judgment on the merits; (3) a necessary issue with the estopped party given a full and fair opportunity to litigate; (4) a prior losing litigant[]"); *Chesley v. Abbott*, 524 S.W.3d 471, 482 (Ky. App. 2017). Furthermore, we have applied this doctrine in attorney disciplinary proceedings. *Ky. Bar Ass'n v. Harris*, 269 S.W.3d 414, 418 (Ky. 2008); *Ky. Bar Ass'n v. Horn*, 4 S.W.3d 135, 137 (Ky. 1999). Additionally, the Trial Commissioner stated he had reviewed the hearing transcript and the witnesses'

14

testimony and concluded that Judge Mehling's finding was correct. Like the Trial Commissioner, we conclude that Dusing caused Otis to offer a cash inducement to Dr. Connor to change his report, and that in so doing Dusing is guilty of violating both SCR 3.130(3.4)(b) and SCR 3.130(8.4)(a).

We also find Dusing guilty of all remaining charges in 21-DIS-0046. Dusing filed at least seven repetitive motions for Judge Mehling's recusal and an inordinate number of separate appeals. Dusing's litigation tactics exceeded reasonable advocacy and were solely calculated to disrupt the Family Court Proceedings. This conduct violated SCR 3.130(3.5)(d)'s prohibition against engaging in conduct intended to disrupt a tribunal.

Next, Dusing's scheme to disrupt the Family Court Proceedings also extended to the making of threats of disciplinary complaints against both Judge Mehling and Dietz. This resulted in two violations of SCR 3.130(3.4)(f). The mere filing of such complaints, of course, is not afoul of the Rule, but rather the violation occurs in the filing or threatening to file such complaints "solely to obtain an advantage in any civil or criminal matter." SCR 3.130(3.4)(f). Whether the disciplinary complaints have merit is tangential to this issue. *See Blum*, 404 S.W.3d at 850 (stating "[i]n our view, it is 'only marginally consequential whether the target lawyer has in fact behaved unethically.' Rather, the 'focal point here is the purpose of the threat and not the conduct of the lawyer being threatened[]'" (quoting

Douglas R. Richmond, *Saber–Rattling and the Sound of Professional Responsibility*, 34 AM. J. TRIAL ADVOC. 27, 61 (Summer 2010)). The evident

15

purpose of such threats was solely to intimidate the participants in these judicial proceedings and thereby obtain a disruption in order to gain an advantage. *See Adams v. Ky. Bar Ass'n*, 843 S.W.2d 898 (Ky. 1993) (unethical and unprofessional conduct to threaten arrest for nonpayment of school material fees). We thus find Dusing guilty of two violations of SCR 3.130(3.4)(f). And, because his campaign against Judge Mehling involved intentionally or recklessly made false statements against the judge, Dusing also violated SCR 3.130(8.2)(a): "[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge[.]"

### C. 21-DIS-0142 (Tapke litigation)

The next set of charges against Dusing arose out of his conduct in the Tapke litigation. With respect to these charges, we find Dusing guilty of violating SCR 3.130(3.5)(d) and SCR 3.130(4.4)(a)[6] insofar as his disruption of the Family Court Proceedings included a barrage of motions and repetitive emails to the GAL appointed in that case for the obvious purpose of burdening the GAL and thereby further disrupting the proceedings. While Dusing attempts to justify these actions regarding the GAL, we simply state his excuses are non-availing.

---

[6] SCR 3.130(4.4)(a) prohibits a lawyer from using "means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person."

16

In this matter, the KBA also charged a violation of SCR 3.130(3.1), which states "[a] lawyer shall not knowingly bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law." Our review of the Trial Commissioner's Report is that neither he nor the Board seems to have found a violation of this rule. The record, however, is replete with multiple instances of Dusing filing frivolous motions and appeals, and being sanctioned by Judge Mehling for violations of CR[7] 11[8]. That Dusing violated this rule is amply demonstrated by the Trial Commissioner's summation of a Court of Appeals Order, dated November 16, 2021:

> [O]ver the course of the single year, Dusing had brought a total of 22 appellate actions against Tapke and/or Bakker consisting of three original actions and 19 direct appeals. All 3 original actions have been denied. The Court of Appeals found:

---

[7] Kentucky Rule of Civil Procedure.

[8] Cr 11 states in relevant part,

The signature of an attorney or party constitutes a certification by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Finally, Dusing has expended an inordinate amount of this Court's time and resources with frivolous motions and appeals. . . .

Dusing has repeatedly attempted to [a]ppeal from interlocutory Orders and, stated quite frankly he should know better. We could discern no legitimate reason to explain why Dusing has chosen to proceed in these appellate cases. We can only conclude Dusing's purpose is to harass, cause unnecessary delay, or needlessly increase the cost of litigation for Tapke and Bakker.

We conclude Dusing violated SCR 3.130(3.1), SCR 3.130(3.5)(d) and 3.130(4.4)(a).

### D. 21-DIS-0192 (Facebook Video)

Finally, in 21-DIS-0192, the KBA charged that by posting the November 2, 2021, Facebook video, Dusing violated SCR 3.130(3.5)(d)'s prohibition against attorneys engaging "in conduct intended to disrupt a tribunal." We find Dusing guilty of this charge as his posting of the Facebook video was plainly intended to—and indeed did—disrupt the Family Court Proceedings.

Dusing, as he must, apologizes for posting the video and acknowledges that it was a mistake of judgment. Dusing argues that he was not trying to disrupt the tribunal but was, instead advocating for court reform. While he claims the video was due to his frustration at the "corruption" between trial court staff and Bakker's counsel, the incident which led to the video was, in fact, a standard email communication between counsel and court staff which included both Dusing and his counsel, and for which no one was given advantage or disadvantage. As to Dusing's pitch for "court reform," we refer to the transcript of the video, *supra*, although we note that the transcript simply

18

does not do full justice to how completely inappropriate Dusing's actions were in this regard.

Furthermore, Dusing's video tirade was entirely consistent with his abusive and threatening language directed against the mothers of his children, as recounted by Judge Mehling's various orders. We recount just one such instance, merely because including others only serves to unduly lengthen this opinion, and the following actually serves to give insight into Dusing's complete lack of self-awareness. The Family Court noted Dusing also wrote Bakker, "[y]ou are a horrible horrible horrible example for your children. . . . God you're such a little bitch victim I lose so much respect. Even if you are a fucking super bitch nonsense woman **it's still important to me to be a man of character, decency and respect**." (Emphasis added). Considering the full record of the Family Court Proceedings, this must be the most ironic statement in all of Kentucky's jurisprudential history.

As to Dusing's post-hoc protests that he did not intend his statements in the video as a physical threat, we recognize that "blowing someone up" can have alternative meanings. One is a literal meaning to harm physically or to kill by an explosion, as with dynamite. The other is an idiomatic meaning to make someone's life a living hell, by posting scurrilous and libelous matter on social media, engaging in frivolous litigation tactics, and the like.

On one hand, the fact that Dusing had just "blown up" Dietz and Keys, in the idiomatic sense, by his Facebook video, and had a history of engaging in frivolous litigation in the Family Court Proceedings supports the conclusion

19

that his threat to blow them up was, in fact, a threat of physical violence. Additionally, family court litigation, unfortunately, is replete with incidents of physical violence. *See, e.g., Boyfriend kills girlfriend, her mother in shooting outside Kentucky courthouse,*" ABC News, Aug. 19, 2024 (https://abcnews.go.com/US/elizabethtown-kentucky-courthouse-shooting/story?id=112953536) (last accessed Aug. 26, 2024). Any reasonable person—and certainly any attorney with a history practicing in criminal matters such as Dusing—would plainly understand that threatening to "blow [someone's] asses up" might be perceived as a physical threat of violence. Dusing's contention that he did not intend or expect Judge Mehling or the staff attorney to see the video is simply untenable. Dusing posted the video in a public social media forum and made pointed attacks on the staff attorney and opposing counsel by name. Indeed, Dusing expressly addresses the staff attorney and opposing counsel from the very opening lines of the video, stating "[a]lright. Alice Keys and Stephanie Dietz, we need to have a little talk . . . ." Plainly, it was inevitable for the video to make its way to its intended targets.

On the other hand, we find it difficult to believe that someone, especially an attorney with 20 years' experience, would post a physical threat on a public forum. Common sense typically dictates that most people seeking to commit a crime do not telegraph their plans. Doing so not only warns the intended target but also tips off law enforcement. As to possible crimes, Dusing's video

most approximated either menacing,[9] or terroristic threatening in the third degree,[10] both of which are misdemeanors. Notably, Dusing was not charged with either crime.

In sum, we conclude that Dusing did not post the video to remedy any actual or even perceived corruption in the courts. Rather, Dusing seized upon the unremarkable communications between Dietz and staff attorney Keyes as an opportunity to attack those participants in the legal system and obtain Judge Mehling's recusal. In so doing, Dusing unquestionably intended to—and did—disrupt the Family Court proceedings by improperly obtaining the recusal of Judge Mehling, and thus also violated SCR 3.130(3.5)(d). *See Blum*, 404 S.W.3d at 854 (noting that "disrupt" for purposes of the Rules means, among other things, "to interrupt the normal course of unity of[]").

### III. SANCTION

As a sanction for Dusing's misconduct, the Board recommends we impose a three-year suspension running from the date of this Order without credit for time served by Dusing during his temporary suspension. Dusing argues that in the event we find him guilty, we impose a 180-day suspension with credit for the time served since his temporary suspension became effective on February 24, 2022. After careful consideration of the range of sanctions,

---

[9] See KRS 508.050(1): "A person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury."

[10] See KRS 508.080(1): "[A] person is guilty of terroristic threatening in the third degree when: (a) He threatens to commit any crime likely to result in death or serious physical injury to another person[.]"

including possible permanent disbarment and a lengthier term of years' suspension, we agree to impose the Board's recommended sanction of a three-year suspension from the date of this Order without any credit for Dusing's previous time of suspension since February 24, 2022.

We have previously noted that the purpose of lawyer sanctions includes protecting "the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession." *Ky. Bar Ass'n v. James*, 575 S.W.3d 687, 693 (Ky. 2019) (quoting the ABA Standards). In determining an appropriate sanction, we often find persuasive the ABA Standards for Imposing Lawyer Sanctions. *Anderson v. Ky. Bar Ass'n*, 262 S.W.3d 636, 639 (Ky. 2008) (stating that "[w]hile the ABA's *Standards* are not binding authority on this Court by any means, they can at times serve as persuasive authority."). Relevant considerations in determining an appropriate sanction include the lawyer's mental state, the duties or ethical obligations violated, and actual or potential injury to a client. *See Ky. Bar Ass'n v. Powell*, 681 S.W.3d 152, 159 (Ky. 2023). We also find relevant the extent to which the attorney's conduct demonstrates a lack of respect for the judiciary and the judicial process, brings the judiciary or the legal profession into disrepute, threatens the fundamental integrity of the judicial process, or otherwise results in injury to the judiciary or the profession. *See, e.g., Mefford v. Ky. Bar Ass'n*, 474 S.W.3d 923, 924 (Ky. 2015). We also consider the

22

existence of any aggravating or mitigating factors. *See Powell*, 681 S.W.3d at 159.

As an initial matter, we reject out-of-hand Dusing's proposed 180-day suspension with credit for time already served. Our rules on reinstatement explicitly recognize a difference between a suspension of fewer than 181 days, and one of 181 days or more. *Compare* SCR 3.501 *with* SCR 3.502. Admittedly, both processes may wind up in the same place, with a hearing before the Character and Fitness Committee, but a suspension of less than 181 days includes an intermediate Inquiry Commission determination, for which approval ends the process and automatically serves to restore the applicant to practice. SCR 3.501(6). Our view is that Dusing's behavior (i) is sufficiently egregious that a 180-day suspension with credit would be tantamount to a slap on the wrist, and (ii) has raised enough red flags that his reinstatement should be viewed by as many persons as possible with its attendant burden of proof. SCR 3.503.

Dusing argues that no Kentucky case has ever suspended an attorney for his actions in representing himself, and that the purpose of lawyer disciplinary proceedings is to protect the public and not to punish lawyers. As to Dusing's first point, he ignores that the Preamble to the Rules of Professional Conduct explicitly provide otherwise:

> VI. A lawyer's conduct shall conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer shall use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer shall demonstrate respect for the legal system and for those who serve it, including judges, other lawyers

and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.

Dusing's actions in the Family Court Proceedings, although involving his personal affairs, did not conform to the requirements of the law, that is, the Rules of Professional Conduct. *See, e.g., Ky. Bar Ass'n v. Morgan*, 465 S.W.3d 447 (Ky. 2015) (holding attorney's failure to provide support for his two minor children in violation of court order justified 90 day suspension since an attorney's "duty and . . . responsibility . . . as an officer of the court [is] to conduct [his or her] personal and professional life in such manner as to be above reproach[]"). Dusing failed to use the law's procedures for legitimate purposes and instead intentionally sought to harass and intimidate others. And, he clearly failed to demonstrate respect for the legal system, the judges, especially Judge Mehling, and other lawyers, specifically attorneys Deitz and Keys. In other words, the fact that a lawyer is representing himself does not give him a free pass. Regardless of whether no previous Kentucky case has so sanctioned a lawyer, there is one now and the Bar should accordingly be disabused of any notion otherwise.

As to Dusing's second point, about the public protection being purpose of lawyer discipline, he does not quite go far enough. "The purpose of lawyer disciplinary proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system and the legal profession." *James*, 575 S.W.3d at 693; ABA

24

Annot. Stds. for Imposing Lawyer Sanctions ("ABA Standards") § 1.1 (2d ed. 2019). Dusing ignores that the Family Court Proceedings involved the administration of justice and that he, as a lawyer, failed to properly discharge his professional duties. Again, the fact that he represented himself does not give him a free pass.

The parties cite the ABA Standards for the framework to consider in imposing a sanction: "In imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." ABA Standards § 3.0.

Duties Violated. Dusing violated SCR 3.130(3.1); SCR 3.130(3.4)(b); two counts of SCR 3.130(3.4)(f); three counts of SCR 3.130(3.5)(d); SCR 3.130(4.4)(a); SCR 3.130(8.2)(a); and SCR 3.130(8.4)(a). We accept Dusing's argument that none of these counts violated duties to a client. However, as pointed out by Bar Counsel, these violations are of duties owed to the public and the legal system. The ABA Standards provide that "lawyers violate their duties to the public when they commit a criminal act that reflects adversely on their honesty, trustworthiness or fitness as a lawyer." ABA Standards § 3.0 at 130. While this matter did not involve criminal charges, the KBA proved by a preponderance of the evidence, at a minimum, that Dusing sought to bribe Dr. Connor. And, "lawyers, as officers of the court, owe a duty to the legal system not to engage in conduct prejudicial to the administration of justice or conduct

25

that involves dishonesty, fraud, deceit, or misrepresentation to a court." *Id.* All the remaining counts implicate Dusing's duties to the legal system.

Dusing's Mental State. The ABA Standards recognize three mental states: intentionally, knowingly, and negligently. *Id.* at 133. These mental states determine the degree of culpability, since intentional or knowing conduct threatens more harm to the public, the legal system and the profession. *Id.* (citing *In re Van Dox*, 152 P.3d 1183, 1186 (Ariz. 2007)). The ABA Standards state that "intentional" misconduct "arises when a lawyer acts with a conscious objective or purpose to accomplish a particular result." *Id.* at 134. By contrast, "knowing" misconduct "occurs when a lawyer acts with conscious awareness of the nature or attendant circumstances of the conduct, but without the conscious objective or purpose to accomplish a particular result." *Id.* at 135 (internal quotation and citation omitted). The least culpable mental state is negligence which "occurs when a lawyer lacks awareness of a substantial risk that circumstances exist or that a result will follow." *Id.* at 136-37 (internal quotation and citation omitted).

The Trial Commissioner found that Dusing acted intentionally since he acted repetitively and over a significant period of time. Bar Counsel agrees with the Trial Commissioner. Dusing argues that his conduct was at most knowing, and flowed from the understandable circumstance that he was involved in litigating a family matter involving his children. We agree with the Trial Commissioner that this extensive record reveals that Dusing's violations were intentional.

26

Potential or Actual Injuries Caused.  The Trial Commissioner stated that no proof was offered as to any serious or potential serious injury, but that "it is not hard to imagine the toll taken on the litigants and the Court."  "Serious injury, actual or potential" is not, however, the injury case law addresses.  Our jurisprudence is replete with cases in which no actual injury occurred, either by failure to keep clients advised, failure to communicate, or failure to properly account for trust funds (although client moneys were not lost).  *See, e.g., Mohon v. Ky. Bar Ass'n,* 638 S.W.3d 417 (Ky. 2022) (finding multiple violations and ordering suspension and conditions, including restitution).  Rather, actual injury can be inflicted on a client, the public, the legal system, or the profession.  ABA Standards § 3.0 at 138-39.  Dusing's actions caused real, actual injury to the public, *i.e.*, the attempted bribe of Dr. Connor, and to the legal system, *i.e.*, Dusing's legal assault on the Court of Appeals (which ruled Dusing is a frivolous litigant and created a procedure to address his appeals), Judge Mehling, attorneys Dietz and Keys, and not least of all, the mothers of his children, Tapke and Bakker, who have endured years of frivolous and vexatious litigation.  Dusing might pause to consider the emotional wellbeing of his children who undoubtedly suffer as a result of his actions towards their mothers.

Aggravating or Mitigating Factors.  The Trial Commissioner found no mitigating circumstance and did not address aggravating circumstances, other than a lack of remorse.

27

Dusing claims a number of mitigating circumstances: a) improving the court system through his Facebook video; b) substantial monetary sanctions imposed by the trial court; c) loss of income due to suspension; d) attorney fees incurred; e) reliance on independent counsel; f) high quality of prior legal work; g) no prior discipline; h) public service in Ukraine following suspension; i) extreme negative publicity throughout proceedings; and j) limitations on seeing his children. We find the Ukraine public service is commendable and that the lack of prior discipline is a mitigating factor. However, five of these "mitigating circumstances" are merely the likely and foreseeable consequences of Dusing's actions.[11]

As to aggravating factors, we agree with the Trial Commissioner that Dusing has no remorse about his actions. Further, we agree with Bar Counsel that he displayed a dishonest or selfish motive in that his actions were not on behalf of a client, but only on his own behalf; Dusing's actions were not an isolated case, but instead involved a series of actions over a protracted period; the actions were consolidated from two domestic cases and involved three separate disciplinary files; Dusing was found guilty on all ten counts; Dusing has substantial experience as an attorney, 20 years; and, arguably, the attempted bribery of Dr. Connor was a criminal offense.

The Trial Commissioner recommended, and the Board approved a three-year suspension without credit. Both parties have cited *Blum*, 404 S.W.3d 841,

---

[11] An apt analogy is the boy who is convicted of murdering his parents and then asks the court to show mercy because he's an orphan.

28

in support of their positions. In *Blum,* an attorney was charged with five violations of the Rules of Professional Conduct arising from his representation of a schoolteacher charged with misconduct. Ultimately, Blum was found guilty of only three violations, SCR 3.130(3.4)(f) (threatening disciplinary charges to obtain advantage); SCR 3.130(3.5)(c) (conduct intended to disrupt a tribunal); and SCR 3.130(8.2)(a) (knowing or recklessly false statements about qualifications or integrity of judge, adjudicatory officer or public legal officer). Superficially, Blum's actions and these three charges, in a sense, parallel those of Dusing. We note, however, the differences: Dusing was found guilty of ten charges; his actions were incurred in two cases; those actions were not merely in zealous advocacy of a client but for selfish purposes of his own. And, significantly, notwithstanding our giving Dusing some of the benefit of the doubt on the Facebook video, in that moment, that video had the effect of terrorizing two lawyers and was sufficiently concerning to Judge Mehling that he recused. That conduct is simply unacceptable and merits a more severe punishment.[12]

We affirm the sanction recommended by the Board of Governors.

---

[12] The two most severe sanctions typically imposed by this Court are a five-year suspension and permanent disbarment. We are not, however, limited to five years. Because the sanction in this case is imposed without credit, it effectively results in a suspension exceeding five years.

## ORDER

For the foregoing reasons, it is hereby ORDERED that:

1. Respondent, Benjamin Gerald Dusing, KBA No. 89178, is suspended from the practice of law for a period of three years from the date of this Order. Dusing shall not receive credit for the time temporarily suspended by this Court on February 24, 2022.

2. Pursuant to SCR 3.390, Dusing, if he has not already done so, shall, within twenty days from the entry of this Opinion and Order, notify all clients in writing of his inability to represent them, and notify all courts in which he has matters pending of his suspension from the practice of law, and furnish copies of said letters to the Office of Bar Counsel, assuming that this is necessary given that he is currently suspended from the practice of law.

3. Pursuant to SCR 3.390, Dusing shall, to the extent possible and necessary, immediately cancel and cease any advertising activities in which he is engaged, assuming that this is necessary given that he is currently suspended from the practice of law.

4. In accordance with SCR 3.450, Dusing is directed to pay the costs of this action in the amount of $18,014.33, for which execution may issue from this Court upon finality of this Opinion and Order.

VanMeter, C.J.; Bisig, Conley, Keller, Lambert, and Thompson, JJ., sitting. Bisig, J., concurs in part and dissents in part by separate opinion in which Conley, J., joins. Nickell, J., not sitting.

30

BISIG, J., CONCURRING IN PART & DISSENTING IN PART: I agree with the majority Opinion's conclusion that Dusing is guilty of violating the ethical rules cited above. However, I strongly disagree that the three-year suspension recommended by the Board of Governors is a sanction sufficient for the egregious—and unprecedented—nature of the conduct before us.

Put simply, Dusing manifested unmitigated contempt for the judicial system and its important work of providing justice to the citizens of the Commonwealth—an endeavor he is ethically bound to honor and serve as an officer of the court. He nakedly defied our ethical rules in the pursuit of seemingly manipulating and distorting the facts and defrauding the court in order to achieve his desired goal in litigation. And perhaps most significantly, he broadcast blatant public threats of physical violence against our courts and staff.

In my estimation, a three-year suspension is overwhelmingly inadequate to address the profoundly serious and troubling nature of Dusing's conduct. This Court is duty-bound to ensure that the citizens of this Commonwealth are served by competent attorneys of high ethical standards. This Court is also duty-bound to protect the judges and other judicial staff under its aegis from threats of violence and attack. Those duties may only be met by the issuance of a significant sanction against the conduct we consider today. Woefully, because the Court's sanction falls far short of the mark, I respectfully dissent.

## ANALYSIS

This Court's review of attorney disciplinary matters is conducted *de novo*. That is, "[t]he findings of fact by the Trial Commissioner and the Board are advisory only. The Court makes an independent review of the record and findings of fact and may 'enter such orders or opinion as it deems appropriate on the entire record.'" *Kentucky Bar Ass'n v. Maze*, 397 S.W.3d 891, 897 (Ky. 2013); *see also Kentucky Bar Ass'n v. Blum*, 404 S.W.3d 841, 846 (Ky. 2013) ("[W]e review alleged violations de novo."). We likewise consider an appropriate sanction *de novo*. *Kentucky Bar Ass'n v. Steiner*, 157 S.W.3d 209, 211 (Ky. 2005) ("It is our job to establish the appropriate sanction."). In other words, we are not bound by the Board's sanction recommendation, but rather may increase or decrease the severity of the sanction as we deem appropriate. Indeed, we may even impose permanent disbarment where the Board recommends only suspension from the practice of law. *See Kentucky Bar Ass'n v. Rice*, 229 S.W.3d 903, 903 (Ky. 2007) (imposing sanction of permanent disbarment where Board recommended five-year suspension). In attorney disciplinary proceedings the KBA bears the burden to prove the facts by a preponderance of the evidence, while the respondent attorney bears the burden of proving any credible defense to the charge. SCR 3.330(4); *Steiner*, 157 S.W.3d at 213.

### I. 21-DIS-0192

In 21-DIS-0192, the KBA charges that by posting the November 2, 2021 Facebook video, Dusing violated SCR 3.130(3.5)(d)'s prohibition against

32

attorneys engaging "in conduct intended to disrupt a tribunal." I agree with the Majority that Dusing is guilty of this charge as his posting of the Facebook video was plainly intended to—and indeed did—disrupt the Family Court Proceedings.

Dusing apologizes for posting the video and acknowledges that it was a mistake of judgment. Dusing asserts however that the video was not intended to disrupt the tribunal. Rather, he asserts he posted the video as part of a public advocacy effort to reform the courts. I am unpersuaded.

First, the credibility of Dusing's contention that he posted the video in righteous indignation at purportedly corrupt conduct in the Family Court Proceedings is significantly undercut by the fact that the communications between Dietz and Judge Mehling's staff attorney were in no way indicative of judicial corruption. In his testimony before the Trial Commissioner, Dusing asserted that Dietz intentionally filed her motions late to keep them off the pre-ruling docket, then raised the issue of the motions with the staff attorney, who then designated the motion as "to be called" at motion hour. Perhaps most obviously, the conduct of which Dusing complains was *opposing counsel's* late filing of the motion. Dusing offers no evidence that the court had any involvement in deciding when Dietz would file her motions, or that the court's decision to place the late-filed motions on for hearing at motion hour was somehow preferential treatment. Indeed, the ultimate result was simply that one of Dietz's motions was denied, with the other passed to motion hour for consideration by Judge Mehling. Moreover, there was plainly no surreptitious

33

effort by opposing counsel to obtain beneficial judicial treatment, given that **Dusing and his counsel were included on all the communications at issue.**

Quite simply, any reasonable attorney would have seen the communications between Dietz and Keys as entirely anodyne and unremarkable. And certainly, no reasonable attorney could possibly conclude those communications warranted such an overwhelmingly vitriolic and public diatribe. Indeed, it is difficult to imagine language less appropriate to address the simple passing of a motion to motion hour for consideration by the judge—or indeed to address even serious judicial impropriety—than "[g]ive me a fucking reason to blow your asses up. It'd be the best Christmas gift I've ever gotten." Or "[y]ou can't go cry to your mommy and say Ben's a meany pants, play the victim, talk about how I motherfucked you up and down, and reamed your ass out, which I'm about to." In short, Dusing's assertion that the video was provoked by judicial impropriety is entirely preposterous.

Second, the extreme nature of Dusing's tone and language also further undermines the credibility of his assertion that the video was intended to further his advocacy for judicial reform. The types of thinly veiled threats of physical violence, ad hominem attacks, and coarse and abusive language used by Dusing have no place in legitimate public discourse. I find it hard to conclude that anyone, much less an attorney, could believe such language would be appropriate, much less effectual, in persuading public opinion on a need for judicial reform.

34

During the hearing before the Trial Commissioner, Dusing presented as an intelligent and articulate speaker. From this I deduce both that Dusing is capable of adopting an appropriate tone for public advocacy, and that he would have known the tone employed in the video was ill-suited to the purpose of advocating for judicial reform. I thus conclude that the video was not intended to further any advocacy Dusing may have undertaken for reform of the court system.

Tellingly, the extreme language used by Dusing in the video is instead far more consistent with his previous personal attacks on others than with any public advocacy. When considering Dusing's defense of these statements as legal reform, it is instructive as to his motive to note this record has additional examples of Dusing's use of similarly threatening, abusive, and bullying language in personal attacks. For example, the Family Court noted in its custody judgment that Dusing had made the following written statements about his ex-wife:

> Do I enjoy wearing Julie out? Why yes, yes I do. Toe across the line. SLAP! Finger across the line. SLAP!!!! Will do this until the cows come home. And then they just get tired and give up and start doing the right thing not because they really want to do the right thing, but b/c they're just tired of getting SLAPPED! All. Fucking. Day.

As the Majority notes, the Family Court further also found that Dusing wrote Bakker "You are a horrible horrible horrible example for your children. . . .

35

God you're such a little bitch victim I lose so much respect.  Even if you are a fucking super bitch nonsense woman it's still important to me to be a man of character, decency and respect."  He also wrote to Bakker

> You are such a despicable human for crushing people and kids . . . How many lives are you trying to ruin. . . . You are scum.  Total scum.  You will pay for this . . . . You are a selfish, irresponsible, kid-killing horror . . . a dike bit by cunt rag of a human to me . . . . Now listen you stupid homewrecking kid-killing worthless tramp. You are trash.  You really are.  Abort that baby or give it up for adoption.  You are no mother.  Maybe you are going to do us all a favor and die of cancer in a year or something . . . . You deserve to rot in hell. . . .  I hope you die.

Like these statements, the language in Dusing's video launched repeated ad hominem attacks laced with coarse and abusive language and thinly veiled wishes of physical harm.  Given this striking similarity, I conclude an evident intention of Dusing's Facebook video was to personally attack Keys and Dietz, not to further any legitimate public advocacy for judicial reform.

Finally, I also conclude Dusing posted the video not only to personally attack Dietz and Keys, but also more fundamentally to disrupt and control the Family Court Proceedings.  Tellingly, at the time Dusing posted the video he had filed at least seven unsuccessful motions to disqualify Judge Mehling.  In posting his extreme and physically threatening video, Dusing publicly attacked Judge Mehling's chambers and the handling of his case, and also placed Judge

36

Mehling's staff attorney in fear for her life. And of course, any reasonable attorney—and particularly one with as much litigation experience as Dusing—would know that such conduct would require the recusal of the judge. It is thus unsurprising that after Dusing posted his video, Judge Mehling was forced to recognize the appearance of impropriety that would arise from his continued involvement in a case involving a litigant who had engaged in such conduct and recuse *sue sponte* from the Family Court Proceedings. As such, I must conclude that a significant motivation—and likely the primary motivation—for Dusing's posting of the video was to obtain the recusal of Judge Mehling he had been unable to achieve by motion practice. Such an intention was of course also an intention to disrupt the Family Court in its consideration of his cases. *See Blum*, 404 S.W.3d at 854 (noting that "disrupt" for purposes of the Rules means, among other things, "to interrupt the normal course of unity of.").

I am unmoved by Dusing's post-hoc protests that he did not intend his statements in the video as a physical threat. Any reasonable person—and certainly any attorney with a history practicing in criminal matters such as Dusing—would plainly understand that threatening to "blow [someones'] asses up" is and will be perceived as a physical threat of violence. I am also unpersuaded by Dusing's contention that he did not intend or expect Judge Mehling or the staff attorney to see the video. Dusing posted the video in a public social media forum and made pointed attacks on the staff attorney and opposing counsel by name. Indeed, Dusing expressly addresses the staff

37

attorney and opposing counsel from the very opening lines of the video, stating "[a]lright. Alice Keys and Stephanie Dietz, we need to have a little talk . . . ." Plainly, it was inevitable for the video to make its way to its intended targets.

In sum, it is apparent that Dusing did not post the video to remedy any actual or even perceived corruption in the courts. Rather, I conclude that Dusing seized upon the unremarkable communications between Dietz and staff attorney Keys as an opportunity to attack those participants in the legal system and obtain Judge Mehling's recusal. In so doing, Dusing unquestionably intended to—and did—disrupt the Family Court proceedings by improperly obtaining the recusal of Judge Mehling, and thus also violated SCR 3.130(3.5)(d).

## II.    21-DIS-46

In 21-DIS-46, the KBA makes a number of additional charges against Dusing all arising out his conduct in the Bakker litigation. The first I will address is the KBA's charge that in assisting or inducing his counsel Otis to bribe Dr. Connor, Dusing violated SCR 3.130(3.4)(b). That Rule provides that a lawyer shall not "knowingly falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law." Kentucky law prohibits offers of pecuniary benefit to a witness or potential witness with intent to influence testimony. *See* KRS 524.020.

Dusing testified before the Trial Commissioner that he did not and would not ask anyone to offer a bribe, nor would he expect that such a direction would be followed. He also contends that Dr. Connor's report was favorable

38

and thus he had no incentive to offer such a payment. He further points us to testimony by Otis after the Trial Commissioner's hearing in which Otis testified there was no bribe. Again, after a review of the record, I am unpersuaded.

At an evidentiary hearing before the Family Court, Dr. Connor explicitly testified that Otis offered him a $5,000 payment to say his report was not yet complete:

> [M]y report was complete. . . . And then Mr. Otis came to my office basically saying that there was additional information he wanted to give me to review and that – asserted that my report was not complete. And I stated that it was, and he offered the $5,000 basically to state that the report was not complete. . . . I was struck by his insinuation that there was so much more work to be done that he could offer me a certain amount of money to agree to that. And I do not agree to that.

I find Dr. Connor's testimony particularly credible given that a former friend of Dusing's also testified to a conversation she heard between Dusing and Otis about Dusing sending Otis "to manage Dr. Connor and get the – what they wanted out of him. Get the answers they wanted. They were willing to pay, or they were going to sue him personally." Moreover, Dusing points us to no motivation Dr. Connor would have had to falsely testify he had been offered money to change his report.

And while Dusing contends Dr. Connor mistakenly believed he had been retained by the court rather than Dusing, that in no way negates the straightforward testimony from Dr. Connor that Dusing's counsel offered him a monetary payment to change his report. I also find unpersuasive Dusing's contention he had no incentive to bribe Dr. Connor because Dr. Connor's report was favorable him. As the Family Court noted in its judgment, Dr.

39

Connor recommended that Bakker have sole custody; recommended a very limited parenting schedule for Dusing; indicated that Dusing was "self-centered, degrading and demeaning" and "incapable of negotiation or cooperation;" had concern about Dusing's use of public humiliation to discipline his children; and expressed concerns about child safety given Dusing's conduct. Dr. Connor's report was certainly not favorable to Dusing, and I find Dusing's assertion that he had no reason to seek alteration of the report uncredible.

Finally, while Otis may have testified after the hearing before the Trial Commissioner that no bribe was offered to Dr. Connor, he certainly has strong incentive to deny such criminal conduct. As such, I conclude that Dusing caused Otis to offer a cash inducement to Dr. Connor to change his report, and that in so doing Dusing is guilty of violating SCR 3.130(3.4)(b).

I also find Dusing guilty of both remaining charges in 21-DIS-46. First, Dusing's filing of at least seven repetitive motions for Judge Mehling's recusal and his filing of an inordinate number of separate appeals was also patently part of a scorched earth litigation effort designed to complicate and disrupt the Family Court Proceedings. The materials filed (including one motion to disqualify with text 87 pages in length) were far beyond the bounds of any reasonably zealous advocacy and were simply another tool used by Dusing in his efforts to disrupt the Family Court Proceedings. This conduct violated SCR 3.130(3.5)(d)'s prohibition against engaging in conduct intended to disrupt a tribunal, and I find Dusing guilty of this charge.

40

Second, Dusing's barely disguised scheme to disrupt the Family Court Proceedings also extended to the making of threats of disciplinary complaints against both Judge Mehling and Dietz. It is of course not the mere filing of such complaints that runs afoul of the Rules, but rather the filing or threatening to file such complaints "solely to obtain an advantage in any civil or criminal matter." SCR 3.130(3.4)(f). It matters little whether the disciplinary complaints have merit. *See Blum*, 404 S.W.3d at 850 ("In our view, it is 'only marginally consequential whether the target lawyer has in fact behaved unethically.' Rather, the 'focal point here is the purpose of the threat and not the conduct of the lawyer being threatened.'"). Considered more broadly in the context of Dusing's extreme efforts to thwart the Family Court and its proceedings, it is apparent his repeated threats of disciplinary complaints were part and parcel of his overall scheme to scuttle his cases before Judge Mehling. Perhaps most telling is Dusing's filing of a motion whose ominous title included "Notice of Judicial Conduct Complaint, Notice of Referral to State and Federal Investigative Authorities, [and] Notice of KBA Investigation." The evident sole purpose of such threats was to intimidate the participants in these judicial proceedings and thereby obtain a disruption in order to gain an advantage. I thus also find Dusing guilty of violating SCR 3.130(3.4)(f).

## III. 21-DIS-142

The third and final set of charges against Dusing arise out of his conduct in the Tapke case. With respect to these charges, I find Dusing guilty of

41

violating SCR 3.130(3.5)(d) and SCR 3.130(4.4)(a) insofar as his campaign to disrupt the Family Court Proceedings extended to a barrage of motions and repetitive emails to the GAL appointed in that case for the obvious purpose of burdening the GAL and thereby further disrupting the proceedings.

Dusing contends he believed the GAL made a misogynistic comment in referring to Dusing's counsel Lawrence as his "girlfriend." In response, Dusing sent the GAL an email stating "This is the last time I use words to express my deepest objection to your conduct in this litigation both personally and professionally. . . . Your decisions and conduct moving forward should take this into account." As with his numerous other instances of deploying wildly inappropriate invective during the Family Court Proceedings, the extreme and inappropriate nature of this blatant threat of physical violence reveals Dusing's true purpose was not to remedy inappropriate misogynistic comments, but rather to burden and threaten the GAL. Moreover, his abusive conduct became so overwhelming that the GAL was forced to file a motion for a protective order. Again, it stretches credulity that Dusing's conduct was mere advocacy. Rather, considered in the context of Dusing's other behavior, it is plain his conduct against the GAL was simply part of his broader campaign to disrupt the Family Court Proceedings and burden its participants with overwhelming litigation tactics and threats of physical violence. As such, I also find Dusing's conduct in the Tapke Case violative of SCR 3.130(3.5)(d) and 3.130(4.4)(a).

## IV. An Appropriate Sanction

As a sanction for Dusing's misconduct, the Board recommends we impose a three-year suspension running from the date of this Order without credit for time served by Dusing during his temporary suspension. Dusing argues that in the event we have found him guilty, we impose a 180-day suspension with credit for the time served since his temporary suspension became effective on February 24, 2022. After careful consideration, I conclude that only a ten-year suspension would be sufficient to address Dusing's severe misconduct.

In determining an appropriate sanction, we often find persuasive the ABA Standards for Imposing Lawyer Sanctions (the "ABA Standards"). *Anderson v. Kentucky Bar Ass'n*, 262 S.W.3d 636, 639 (Ky. 2008) ("While the ABA's *Standards* are not binding authority on this Court by any means, they can at times serve as persuasive authority."). Relevant considerations in determining an appropriate sanction include the lawyer's mental state, the duties or ethical obligations violated, and actual or potential injury to a client. *See Kentucky Bar Ass'n v. Powell*, 681 S.W.3d 152, 159 (Ky. 2023). We also find relevant the extent to which the attorney's conduct demonstrates a lack of respect for the judiciary and the judicial process, brings the judiciary or the legal profession into disrepute, threatens the fundamental integrity of the judicial process, or otherwise results in injury to the judiciary or the profession. *See, e.g., Mefford v. Kentucky Bar Ass'n*, 474 S.W.3d 923, 924 (Ky. 2015) (finding permanent disbarment warranted where attorney's "appalling and reprehensible conduct

43

besmirche[d] the dignity of the profession."). We also consider the existence of any aggravating or mitigating factors. *See Powell*, 681 S.W.3d at 159.

Here, when considered *in toto* it is readily apparent that Dusing's misconduct was all part of an intentional effort to disrupt and thwart the Family Court Proceedings and to inflict injury on the participants in those proceedings. Neither Dusing's multiple threats of physical violence nor his efforts to induce Dr. Connor to alter his report can reasonably be seen as merely negligent. Moreover, Dusing repeatedly violated a number of ethical duties, including the prohibitions against intentionally disrupting judicial proceedings, attempting to induce witnesses to provide false evidence, threatening disciplinary complaints for the sole purpose of gaining an advantage in the proceedings, and harassing and burdening participants in the legal process. And while Dusing was both client and lawyer and thus the only client injured was himself, he also plainly demonstrated a profound contempt for the judiciary and the judicial process. He did so publicly in a campaign that included, at best, multiple thinly disguised threats of physical violence against participants in the legal process. Such public conduct by an officer of the court not only brought the legal profession into disrepute but also threatened the fundamental integrity of the Family Court Proceedings and the judicial process more generally. These factors weigh heavily in favor of a more severe sanction.

I further note the existence of additional aggravating factors that further militate in favor of a far more severe sanction than the three years proposed by

the Board of Governors. Aggravating factors supporting a more severe sanction in lawyer disciplinary matters include "prior disciplinary offenses, a pattern of misconduct, multiple offenses, substantial experience in the practice of law, and refusal to acknowledge the wrongful nature of [the] conduct." *James*, 575 S.W.3d at 693. Here, I acknowledge that Dusing was not the subject of disciplinary action before the present proceedings. However, as noted above, his conduct consisted of multiple offenses that violated numerous ethical obligations in furtherance of a blatant and cynical scheme to thwart and undermine the very judicial process itself. Moreover, Dusing has at most merely paid lip service to acknowledging responsibility for his misconduct. For example, rather than acknowledging the profoundly troubling nature of his physical threats, he chose instead to describe them as poor word choices. Similarly, Dusing has also repeatedly sought to lay blame for much of the conduct at issue at the feet of his counsel. Perhaps most disturbingly, Dusing wholly fails to own his misconduct against staff attorney Keys and the GAL, instead seeking to shift blame to them by repeating plainly false allegations of misconduct and corruption where no such behavior occurred. His unflinching defense of his actions weighs against a shorter sanction. Dusing shows neither true accountability for his behavior nor resolve to take steps to remedy the issues leading to his serious violations.

Dusing's motives appeared to be wholly selfish, given that his conduct was simply part of an unrelenting and merciless campaign to gain every advantage for himself that he could in the Family Court Proceedings. An

45

additional aggravating factor is Dusing's almost-twenty years in the practice of law at the time of his misconduct, including time spent clerking for judges and as a prosecutor. Finally, I also note that Dusing's conduct in attempting to bribe a witness and in physically threatening participants in the legal process were not only ethical violations but undoubtedly unlawful and possibly also criminal.

As for mitigating circumstances, I again acknowledge that Dusing has no history of disciplinary violations before the present proceedings. I also acknowledge that Dusing had a history as an accomplished and respected attorney, and that he has not been sanctioned in the Family Court Proceedings since a new judge was appointed. However, aside from these facts I perceive no further mitigating circumstances. Dusing urges as additional mitigating factors that he has suffered significant financial sanctions and attorney fees in the Family Court Proceedings, negative publicity, and interference with his ability to see his children. However, those are simply the consequences of Dusing's misconduct that in no way mitigate his culpability or the injurious nature of his conduct. Like the Trial Commissioner, I also find irrelevant Dusing's post-suspension work in Ukraine. While laudable, I fail to see how those efforts in any way lessen the severity of Dusing's misconduct or his culpability.

In sum, I find that there are numerous severe aggravating circumstances, offset only by the fact that Dusing had a record as an accomplished and respected attorney without a disciplinary history. Of course,

46

Dusing's status as an accomplished and respected attorney cuts both ways, as the public loss of respect for the legal profession is greater when our brightest representatives behave in such a profoundly troubling way. The behavior is a callous threat to our very system of justice. As such, I conclude that the factors considered overwhelmingly weigh in favor of a far more severe sanction than the three-year suspension recommended by the Board.

I am not persuaded by the cases relied upon by Dusing in arguing that a lesser sanction is warranted. Those cases are readily distinguishable. First, while several involved distasteful and disruptive conduct by attorneys, none involved bribery, threats of physical violence, and a concerted and direct attack on the fundamental integrity of the judicial process itself like that at issue here. *See, e.g., Blum*, 404 S.W.3d 841 (imposing 181-day suspension for attorney's threatening to file disciplinary complaints, making repetitive and unnecessary filings, and making false or reckless statements regarding hearing officer's integrity); *Kentucky Bar Ass'n v. Lavit*, 351 S.W.3d 210 (Ky. 2011) (imposing public reprimand for attorney's intemperate outburst that reflected lack of civility, loss of dignity, and use of aggressive and bullying tactics). And while others involved significantly serious misconduct, again those cases did not involve conduct so apparently designed and capable of undermining the judicial process. *See, e.g., Kentucky Bar Ass'n v. Kaiser*, 814 S.W.2d 923 (Ky. 1991) (imposing three-year suspension for attorney's unlawful practice and dishonesty in Ohio); *Wickersham v. Kentucky Bar Ass'n*, 585 S.W.3d 766 (Ky. 2019) (imposing three-year suspension for attorney driving intoxicated with

47

child in car); *Kentucky Bar Ass'n v. Embry*, 152 S.W.3d 869 (Ky. 2005) (imposing five-year suspension for drug possession and manslaughter).

Unsurprisingly, we have little precedent for guidance as to an appropriate sanction for such extreme misconduct as confronts us in this case. Notably, we have previously found permanent disbarment warranted for attorneys engaged in bribery. *Kentucky Bar Ass'n v. Taylor*, 993 S.W.2d 950, 951 (Ky. 1999) (agreeing with Board recommendation of permanent disbarment where attorney made kickback payments to bank loan officer). Perhaps more significantly, however, we note that Dusing engaged in not one, but rather multiple acts that demonstrated overwhelming disregard for the judicial system. He publicly threatened physical violence against court staff. He threatened physical violence against a GAL. And he attempted to monetarily induce a witness to change evidence. Considered as a whole, his conduct was at best a thinly veiled effort to deploy bribery, threats of physical violence, disciplinary complaints, and inappropriate scorched earth litigation tactics to bend the Family Court Proceedings to his whim. Such conduct manifests a wholesale disregard for the honor and integrity of the judicial system and process. Where, as here, such conduct is undertaken by an attorney, it also stains the dignity and reputation of the legal profession.

I conclude that a three-year suspension for the type of conduct we have before us here is literally unthinkable. *See Mefford*, 474 S.W.3d at 924 (permanent disbarment warranted for "appalling and reprehensible conduct" that "besmirche[d] the dignity of the profession."). Indeed, on the facts before

48

us, permanent disbarment would be consistent with the ABA Standards, which provides that "[d]isbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system." ABA Standards § 7.1. Here, Dusing violated his ethical obligations as a Kentucky lawyer in furtherance of an effort to disrupt and control the Family Court Proceedings and to procure false evidence from Dr. Connor in his favor by means of a financial bribe. Such conduct was plainly for Dusing's benefit. Moreover, Dusing's conduct was a blatant attack upon the integrity of the judicial process, showed overwhelming disregard and contempt for that process, and resulted in serious public injury to the honor and integrity of the judiciary and the dignity and reputation of the legal profession as a whole. Thus, in considering the relevant factors and the totality of the circumstances, I conclude that only the significant and severe sanction of a ten-year suspension is sufficient to address Dusing's gravely contemptuous, unethical, and violent conduct.

Conley, J., joins.

ENTERED: September 26, 2024

_____
LAURANCE B. VANMETER,
CHIEF JUSTICE

49